**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**SOUTHERN DIVISION**

|  |  |
|---|---|
| Stephen M. Williams and Moses R. Jenkins Jr., *on behalf of themselves and all others similarly situated,*<br><br>Plaintiff,<br><br>v.<br><br>United States of America,<br><br>Defendant. | **Class Action Complaint**<br><br>**Jury Trial Demand** |

## COMPLAINT

Plaintiffs Stephen M. Williams and Moses R. Jenkins Jr., on behalf of themselves and all others similarly situated, complaining of Defendant, alleges and says:

### INTRODUCTION

1.     This action arises out of the injuries suffered by thousands of service members, civilian workers, and family members who were exposed to contaminated water at Marine Corps Base Camp Lejeune ("Camp Lejeune"). For more than three decades, toxic chemicals escaped from fuel tanks, industrial facilities, and other sources on and around Camp Lejeune and seeped into the groundwater below. By drinking, cooking with, bathing in, and otherwise coming into contact with that water, hundreds of thousands of men and women working and residing on base were exposed to these chemicals, greatly increasing their risk of contracting cancer and the myriad other life-destroying diseases they are known to cause. All along, the federal government officials charged by order and conscience to ensure the safety of Camp Lejeune's water failed to carry out that duty. Indeed, for decades the government did not even bother to test the water

despite having a legal obligation to do so. And even after discovering the contamination in the early 1980s, government officials failed to warn the victims for decades that they were at increased risk for serious health problems—preventing the screening and other measures that could have saved lives and mitigated harm.

2.     As a result of their exposure to the contaminated water, thousands of men and women who lived and worked at Camp Lejeune from the 1950s to the 1980s ("Relevant Time Period") have contracted serious diseases and chronic conditions, including—but by no means limited to—leukemias, cancers of the bladder, kidney, and liver, non-Hodgkin's lymphoma, and Parkinson's disease. Victims exposed in utero suffered from severe birth defects, and many did not survive. Indeed, so many infants died during the contamination period that one cemetery where hundreds are buried has taken on the grim title of "Baby Heaven."

3.     After decades of delay and obfuscation, the federal government finally came clean about the extent of the contamination in 2008, when, pursuant to an express congressional mandate, the Marine Corps began notifying veterans and family members of their potential exposure. Claims against the United States seeking medical care and benefits for the victims of Camp Lejeune began to flow soon thereafter. But instead of providing the necessary care to service members and others for their injuries, the United States resisted their claims vigorously. When lawsuits were filed under the Federal Tort Claims Act in federal court, the United States escaped liability by invoking North Carolina's ten-year statute of repose—which operated to bar all of the claims even though the government's misconduct had not come to light until well after the statutory period had run.

4.     At long last, the United States has heeded calls to make good on its moral debt to those injured by their exposure to Camp Lejeune's toxic water. On August 10, 2022, the

President signed into law the "Honoring our PACT Act of 2022" ("PACT Act"), which incorporates at Section 804 the Camp Lejeune Justice Act ("CLJA"). The CLJA establishes a simple cause of action permitting individuals who were harmed by the contaminated water at Camp Lejeune over the relevant period to obtain compensation in this Court. Under the CLJA, "[a]n individual, including a veteran . . . or the legal representative of such an individual, who resided, worked, or was otherwise exposed (including in utero exposure) for not less than 30 days during the period beginning on August 1, 1953, and ending on December 31, 1987, to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States may bring an action in the United States District Court for the Eastern District of North Carolina to obtain appropriate relief for harm that was caused by exposure to the water at Camp Lejeune." PACT Act § 804(b). And to meet the burden of proof, a plaintiff need only "produce evidence showing that the relationship between exposure to the water at Camp Lejeune and the harm is . . . sufficient to conclude that a causal relationship is at least as likely as not." Id. § 804(c)(2).

5.     Plaintiff Stephen M. Williams resided at Camp Lejeune between 1953 and 1987. Mr. Williams was subsequently diagnosed with Non-Hodgkin's Lymphoma, among other diseases and conditions. There is overwhelming evidence that the contaminants found in the water at Camp Lejeune caused, or were at least as likely as not the cause of, his injuries. Plaintiff now seeks compensation under the CLJA for substantial medical costs, loss of income, pain and suffering, and other injuries caused by the federal government's decades-long failure to ensure the safety of the water at Camp Lejeune.

6.     Plaintiff Moses R. Jenkins, Jr. resided at Camp Lejeune between 1953 and 1987. Mr. Jenkins was subsequently diagnosed with Prostate and Brain Cancer, among other diseases and conditions. There is overwhelming evidence that the contaminants found in the water at

Camp Lejeune caused, or were at least as likely as not the cause of, his injuries. Plaintiff now seeks compensation under the CLJA for substantial medical costs, loss of income, pain and suffering, and other injuries caused by the federal government's decades-long failure to ensure the safety of the water at Camp Lejeune.

## PARTIES

7.      Plaintiff Stephen M. Williams is a natural person and resident of Statesboro, Georgia. He resided at Camp Lejeune from approximately 1966 until 1968.

8.      Plaintiff Moses R. Jenkins, Jr. is a natural person and resident of Effingham, South Carolina. He resided at Camp Lejeune in 1969 during Marine training.

9.      Defendant United States of America has waived its sovereign immunity from suit under the PACT Act §§ 804(b) and (f).

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction under the PACT Act § 804(d) and 28 U.S.C. § 1331, because this action arises under the Constitution and laws of the United States.

11.      Venue lies exclusively in this district under the PACT Act § 804(d).

## CLASS ALLEGATIONS

**I.      Camp Lejeune's Water Is Highly Contaminated with Dangerous Chemicals for Over Thirty Years**

12.      Named for Major General John A. Lejeune, the 13th Commandant of the Marine Corps, Camp Lejeune is a United States Marine Corps base located just outside of Jacksonville, North Carolina. Established in 1941 and given its current name in 1942, Camp Lejeune has long served as a major training and service facility for the Marine Corps.

13.      From the early 1950s to the mid-1980s, nearly one million service members, their families and others resided at the base at various points in time.

4

14. The United States was responsible for the primary source of drinking water to service members and other residents of Camp Lejeune through, among other means, a series of wells on the base.

15. Camp Lejeune's family housing areas were served by three main water-distribution systems—Hadnot Point (beginning in 1942), Tarawa Terrace (beginning in 1952), and Holcomb Boulevard (beginning in June 1972). Those systems consisted of a collection of wells, a water treatment plant, and a distribution system. They each served a distinct area of the base, except that before 1972 the Holcomb Boulevard area was served by the Hadnot Point system.

16. The following map, reproduced from a 2017 government report, depicts the three areas (Hadnot in green, Holcomb in pink, Tarawa in orange):



17.     Beginning in the mid-1950s, toxic chemicals from various sources, including unlined landfills, leaking storage tanks, and a local dry-cleaning business, seeped into the soil and groundwater of Camp Lejeune and contaminated many of the wells used to supply the water

treatment plants. For many years, however, the United States failed to conduct testing of the water in violation of governing orders and basic duties of care.

18.     In 1979, the United States Environmental Protection Agency ("EPA") promulgated regulations governing drinking water under the Safe Drinking Water Act of 1974, 42 U.S.C. §§ 300f et seq. To comply with those regulations, the Camp Lejeune water utility began testing drinking water at the base.

19.     In the early 1980s, testing determined that the drinking water at both the Hadnot Point plant and the Tarawa Terrace water treatment plant was contaminated by volatile organic compounds ("VOCs") far in excess of safe levels. Because the two water systems operated independently of each other, they were necessarily contaminated from different sources, indicating major problems in and around Camp Lejeune.

20.     The water from the Hadnot Point plant was principally contaminated by trichloroethylene ("TCE"), a degreasing solvent for metal equipment. An assessment commissioned by the United States Navy in 1982 found that the level of TCE in the Hadnot Point plant was as high as 1,400 parts per billion—280 times the current EPA maximum containment level for TCE of five parts per billion.

21.     The water from the Hadnot Point water treatment plant was also contaminated by other VOCs, including perchloroethylene or tetrachloroethylene ("PCE"), a solvent primarily used in dry-cleaning operations, benzene, and vinyl chloride.

22.     The contamination of the Hadnot Point water primarily originated from leaking underground storage tanks, industrial area spills, and waste disposal sites.

23.     The Agency for Toxic Substances and Disease Registry ("ATSDR"), an agency of the U.S. Department of Health and Human Services, has estimated that at least one volatile

7

organic compound found in the Hadnot Point drinking water exceeded its current EPA maximum contaminant level at all times from August 1953 to January 1985.

24.     The principal contaminant in the water from the Tarawa Terrace water treatment plant was PCE. In 1985, a PCE level of 215 parts per billion was detected. As with TCE, the current EPA maximum containment level for PCE is only five parts per billion.

25.     The source of the PCE in the Tarawa Terrace water was the waste disposal practices at ABC One-Hour Cleaners—a private, off-base dry cleaner.

26.     The ATSDR later estimated that PCE concentrations in Tarawa Terrace drinking water exceeded the current EPA maximum contaminant level for 351 months from November 1957 to February 1987.

27.     In addition to the Hadnot Point and Tarawa Terrace distribution systems, the Holcomb Boulevard distribution system was intermittently contaminated by Hadnot Point water between 1972 and 1985. And as noted above, before 1972, the Holcomb Boulevard area was supplied with water by the Hadnot Point system.

28.     Contractors and military scientists repeatedly raised alarms as testing throughout the early 1980s revealed the extent of the contamination. For example, as early as October 1980, the Laboratory Chief of the U.S. Army Environmental Hygiene Agency lab at Fort McPherson took the time to handwrite "Water is highly contaminated with low molecular weight halogenated hydrocarbons" on test results delivered to the Navy. And in early 1981 he issued a pointed, all caps warning alongside the results of a subsequent test: "WATER HIGHLY CONTAMINATED WITH OTHER CHLORINATED HYDROCARBONS (SOLVENTS)!"

29.     But despite these urgent early warnings, officials at Camp Lejeune did not take any steps to close the contaminated wells until benzene was found in the water at Hadnot Point

8

in 1984, and they continued to move slowly even after that shocking discovery. Wells were gradually removed from service over the course of 1984 and 1985, but contaminated water systems at Camp Lejeune were not fully shut down until 1987.

30. In 1989, the EPA named both Camp Lejeune and ABC One-Hour Cleaners "Superfund" sites under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601 et seq.

## II. Studies Confirm Severe Contamination of Camp Lejeune Water and Establish Links to deadly Diseases

31. As required by CERCLA, the ATSDR conducted a Public Health Assessment ("PHA") of Camp Lejeune. The ATSDR completed its initial assessment in 1997.

32. The 1997 ATSDR PHA concluded that individuals who served or resided at Camp Lejeune had been exposed to contaminants of concern in the drinking water. It declared those exposures to be a public health hazard.

33. The 1997 ATSDR PHA was subsequently removed from the agency's website in 2009 after new information emerged, including the fact that benzene had been present in a well in the Hadnot Point system.

34. After the removal of the 1997 Public Health Assessment, the ATSDR completed five health studies[1] of Camp Lejeune:

    a. A 2013 study of whether in utero and infant exposures to contaminated drinking water were associated with birth defects suggested an association between drinking water contaminants and neural tube defects.

    b. A 2014 study compared mortality rates among Marine and naval personnel stationed at Camp Lejeune with mortality rates for Marine Corps personnel stationed at

---

[1] https://www.atsdr.cdc.gov/sites/lejeune/health-studies.html

Camp Pendleton, a Marine Corps base located in Oceanside, California. The study found an elevated mortality rate for the Camp Lejeune personnel for several causes of death, including multiple myeloma, Hodgkin lymphoma, and cancers of the kidney, liver, esophagus, and cervix.

    c.    A 2014 study found that civilians who worked at Camp Lejeune from 1973 to 1985 had elevated mortality hazard ratios for kidney cancer, leukemias, multiple myelomas, rectal cancer, oral cavity cancer, and Parkinson's disease.

    d.    A 2014 study of mothers who lived at Camp Lejeune at the time of delivery suggested associations between TCE exposure and low birth weight and other birth issues. It also found an association between PCE exposure and the risk of preterm birth and an association between benzene exposure and term low birth weight.

    e.    A 2015 study identified associations between exposure to PCE and other chemicals in the Camp Lejeune drinking water and male breast cancer.

35.    In addition to those studies, the ATSDR employed water-modeling techniques and historical reconstruction to estimate concentrations of particular contaminants in drinking water over time and to determine the level and duration of human exposure to contaminated drinking water.

36.    In January 2017, the ATSDR published a superseding PHA[2] for Camp Lejeune.

37.    The 2017 Public Health Assessment reached a number of conclusions about the water supply at Camp Lejeune:

    a. **Hadnot Point Water System**. The 2017 Public Health Assessment concluded that "[r]esidents, workers, Marine and naval personnel, and Marines-in-

---

[2] https://www.atsdr.cdc.gov/sites/lejeune/2017-PHA.html

training at MCB Camp Lejeune were in the past exposed to contaminants in drinking water supplied by the Hadnot Point [water treatment plant]." It further concluded that "this contaminant exposure was at levels that could have harmed their health" and that "[t]he estimated levels to which all the above-mentioned groups of people were exposed could have resulted in an increased cancer risk and increased potential of experiencing adverse, noncancer health effects." According to the ATSDR, "[t]richloroethylene (TCE) and vinyl chloride were the chemicals that contributed most to the increased cancer risk."

b. **Tarawa Terrace Water System**. The 2017 Public Health Assessment concluded that "the Tarawa Terrace [water treatment plant] might have harmed the health of young children," including through "an increased risk of cancer," and that "Marines living in the Tarawa Terrace area who were exposed to water from the Hadnot Point [water treatment plant] during training may have had a higher risk of health-related problems."

c. **Holcomb Boulevard Water System**. The 2017 Public Health Assessment concluded that prior to 1972, when the Holcomb Boulevard Water System was served by the Hadnot Point water treatment plant, residents' exposure to contaminants "could have resulted in an increased cancer risk and increased potential of experiencing adverse, non-cancer health effects."

d. **Lead exposure**. The 2017 Public Health Assessment concluded "past exposure to lead found in tap water at 19 locations could have harmed people's health."

e. **Other Exposures**. The 2017 Public Health Assessment concluded that Marines and civilians who trained in indoor swimming pools in the Hadnot Point area

11

between the early 1950s and 1985, as well as civilians who worked at laundry facilities, were exposed to contaminants at levels that might have harmed their health.

38.     The ATSDR also released a report in January 2017 entitled "ATSDR Assessment of the Evidence for the Drinking Water Contaminants at Camp Lejeune and Specific Cancers and Other Diseases." 3 The report evaluated the links between the contaminants found in the water at Camp Lejeune and various diseases and chronic conditions. It found either "[s]ufficient evidence for causation" or "[e]quipoise and above evidence for causation" for the following diseases or chronic conditions with respect to at least one of the contaminants: kidney cancer, non-Hodgkin's lymphoma, multiple myeloma, leukemias, liver cancer, bladder cancer, Parkinson's disease, kidney diseases, systemic sclerosis/scleroderma, and cardiac defects.

## III.    Congress and the Executive Branch Acknowledge the Harms Caused by Exposure to Contaminated Water at Camp Lejeune

39.     Through statutory enactments and regulatory actions, Congress and the Executive Branch have both recognized the link between exposure to Camp Lejeune's contaminated water and a number of serious diseases and conditions.

40.     In 2012, Congress enacted the Honoring America's Veterans and Caring for Camp Lejeune Families Act, Pub. L. No. 112-554, 126 Stat. 1165. Title I of the statute is entitled the Janey Ensminger Act, in honor of a nine-year-old girl who died of a cancer that she developed from exposure to the water at Camp Lejeune. Id. § 101, 126 Stat. 1167.

41.     The Janey Ensminger Act entitles veterans and their families (including babies who were exposed in utero) who served or resided at Camp Lejeune for at least 30 days between 1957 and 1987 to receive hospital care and medical benefits for fifteen specified illnesses or conditions without having to prove a connection between a veteran's military service and the illness or condition. 38 U.S.C. §§ 1710(e)(1)(F), 1787(a) (2012). Those illnesses and conditions

Case 7:23-cv-00022-D-KS   Document 1   Filed 02/10/23   Page 12 of 23

are esophageal cancer, lung cancer, breast cancer, bladder cancer, kidney cancer, leukemia, multiple myeloma, myelodysplastic syndromes, renal toxicity, hepatic steatosis, female infertility, miscarriage, scleroderma, neurobehavioral effects, and non-Hodgkin's lymphoma. 38 U.S.C. § 1710(e)(1)(F).

42.     Congress later expanded the pool of victims eligible for hospital care and medical benefits to include those who had served or resided at Camp Lejeune as early as August 1, 1953. Consolidated and Further Continuing Appropriations Act, 2015, Div. I, Tit. I, § 243, Pub. L. No. 113-235 (codified at 38 U.S.C. § 1710(e)(1)(F)).

43.     In January 2017, the U.S. Department of Veterans Affairs promulgated a regulation establishing that veterans exposed to the water at Camp Lejeune are entitled to certain disability benefits. Final Rule, Diseases Associated With Exposure to Contaminants in the Water Supply at Camp Lejeune, 82 Fed. Reg. 4173 (Jan. 13, 2017). The regulation provides that a veteran who served at least 30 days at Camp Lejeune between August 1, 1953, and December 31, 1987, "shall be presumed to have been exposed during such service to the contaminants in the water supply." 38 C.F.R. § 3.307(a)(7)(iii). The regulation further provides that if the veteran develops one of eight specified diseases, the Department of Veterans Affairs "will presume that the individual concerned became disabled during that service" for certain purposes. 38 C.F.R. § 3.307(a)(7)(iv). Those eight diseases include two diseases not covered by the Janey Ensminger Act—liver cancer and Parkinson's disease—in addition to bladder cancer, kidney cancer, adult leukemia, multiple myeloma, aplastic anemia and other myelodysplastic syndromes, and non-Hodgkin's lymphoma. 38 C.F.R. § 3.309(f).

44.     Although the 2017 rule provides disability benefits to service members, it does not provide other forms of compensation and it does not provide any compensation for nonservice members who were injured by the contaminated water at Camp Lejeune.

## IV.    Claims Brought by Victims Under the Federal Tort Claims Act Are Consolidated and Dismissed

45.     In the mid-2000s, a half century after the water at Camp Lejeune first became contaminated, the United States Navy began notifying affected individuals about "past water quality issues" at Camp Lejeune. In light of that disclosure, over four thousand veterans and other individuals filed administrative claims with the Navy seeking compensation for their injuries.

46.     A number of injured service members and others whose administrative claims were denied brought suits against the United States in various federal district courts under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680.

47.     As a general matter, the complaints alleged that the government was negligent in its maintenance of the water supply system at Camp Lejeune and had failed to comply with its duty to warn service members and others about their risk of developing cancer and other diseases and conditions from exposure to the water at Camp Lejeune. The complaints explained that the United States had a legal duty to ensure that the water supply was safe for drinking and other purposes, properly constructing wells, and ensuring that the wells could not be contaminated by the surrounding land. The complaints pointed to orders issued by the Department of Navy Bureau of Medicine and Surgery in 1972, known as "BUMEDS," that imposed a detailed set of requirements for ensuring water safety quality—orders that the United States had failed to follow.

14

48.     The complaints further alleged that United States personnel had themselves caused or permitted large quantities of chlorinated solvents and other contaminants to be dumped or disposed of within Camp Lejeune without warning residents. The complaints also alleged that even after the United States knew or should have known that the water supply was dangerously contaminated, it failed to take the necessary steps to warn at-risk individuals and correct the problem.

49.     In 2011, the Camp Lejeune cases were consolidated in a Multi-District Litigation (MDL) in the Northern District of Georgia (MDL No. 2218).

50.     On October 14, 2014, the United States Court of Appeals for the Eleventh Circuit, in a certified interlocutory appeal in the MDL, held that CERCLA does not preempt North Carolina ten-year statute of repose, N.C. Gen. Stat. § 1-52(16) (2010). *Bryant v. United States*, 768 F.3d 1378, 1379 (11th Cir. 2014). The holding was required by the Supreme Court's decision in *CTS Corp. v. Waldburger*, 573 U.S. 1 (2014).

51.     On December 5, 2016, the District Court dismissed the claims without reaching the merits of the plaintiffs' negligence and duty-to-warn claims. See *In re Camp Lejeune N.C. Water Contamination Litig.*, 263 F. Supp. 3d 1318 (N.D. Ga. 2016). The court based its dismissal in whole or in part on three alternative grounds: (i) the claims were barred by North Carolina's ten-year statute of repose, see id. at 1340; (ii) at least some of the claims brought by service members were barred by the doctrine of *Feres v. United States*, 340 U.S. 135 (1950), see *Camp Lejeune N.C. Water Contamination Litig.*, 263 F. Supp. 3d at 1342–1343; and (iii) the claims were barred by the FTCA's discretionary-function exception, 28 U.S.C. § 2680(a), see *Camp Lejeune N.C. Water Contamination Litig.*, 263 F. Supp. 3d at 1360.

52.     On May 22, 2019, the U.S. Court of Appeals for the Eleventh Circuit affirmed the district court's dismissal. See *In re Camp Lejeune, North Carolina Water Contamination Litig.*, 774 F. App'x 564 (11th Cir. 2019). The Court of Appeals based its affirmance exclusively on the North Carolina statute of repose and thus did not reach the other grounds for the District Court's decision. *Id.* at 568.

53.     In the wake of the District Court's decision, the Navy elected to deny all of the thousands of pending claims seeking compensation for harms caused by the government's failure to ensure safe water at Camp Lejeune. The Navy took the position that it lacked the legal authority to pay the claims in light of the district court's ruling.

## V.     Congress Enacts the Camp Lejeune Justice Act

54.     On August 10, 2022, the President signed into law the Honoring our PACT Act of 2022, which incorporates at Section 804 the Camp Lejeune Justice Act. The purpose of the legislation is to supersede the judicial rulings that barred recovery under the FTCA for individuals injured by the contaminated water at Camp Lejeune by providing a new statutory basis for relief.

55.     Section 804(b) establishes a new federal cause of action specifically for those affected by the extensive contamination at Camp Lejeune. It provides that:

> [a]n individual, including a veteran (as defined in section 101 of title 38, United States Code), or the legal representative of such an individual, who resided, worked, or was otherwise exposed (including in utero exposure) for not less than 30 days during the period beginning on August 1, 1953, and ending on December 31, 1987, to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States may bring an action in the United States District Court for the Eastern District of North Carolina to obtain appropriate relief for harm that was caused by exposure to the water at Camp Lejeune.

56.     The CLJA "appl[ies] only to a claim arising before the date of enactment of this Act." PACT Act § 804(j)(1). The statute expressly incorporates the FTCA's requirement that a

claim must be presented to the relevant federal agency before the judicial action may proceed. Id. § 804(h) (cross-referencing 28 U.S.C. § 2675). Under that provision, if the federal agency fails to make a final disposition of a claim within six months of its filing, the claimed is "deemed" denied, allowing the claimant to file an action in court. 28 U.S.C. § 2675(a).

57.     The CLJA makes clear that a plaintiff may obtain a recovery for a "latent disease." PACT Act § 804(e)(1).

58.     To meet the burden of proof under the CLJA, a plaintiff must "produce evidence showing that the relationship between exposure to the water at Camp Lejeune and the harm is— (A) sufficient to conclude that a causal relationship exists; or (B) sufficient to conclude that a causal relationship is at least as likely as not." Id. § 804(c)(2).

59.     The CLJA includes its own statute of limitations and expressly makes inapplicable any other statute of repose or statute of limitations. Id. § 804(j)(2) and (3). The CLJA's statute of limitations provides that "[a] claim in an action under this section may not be commenced after the later of—(A) the date that is 2 years after the date of enactment of this Act; or (B) the date that is 180 days after the date on which the claim is denied under section 2675 of title 28, United States Code." Id. § 804(j)(2).

## VI.     A Class Action Is Appropriate in This Matter

60.     Plaintiff brings this matter on behalf of themselves and those similarly situated. As detailed at length in this Complaint, Defendant orchestrated deceptive and dangerous water hazard contamination practices. United States Servicemen and women were uniformly impacted by and exposed to this misconduct during the reported period. Accordingly, this Complaint is uniquely situated for class-wide resolution.

61. The Class is defined as all persons who were stationed at Camp Lejeune during the relevant time period suffering from medical diagnosis as a result of their exposure to contaminated water sources and have exhausted their administrative remedies as required by the PACT Act and FTCA.

62. The Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy because:

   a. Numerosity: Class Members are so numerous that joinder of all members is impracticable. Plaintiffs believe that there are tens of thousands of Servicemen and women in the Class who are Class Members as described above and who have been damaged by Defendant's deceptive and dangerous practices.

   b. Commonality: The questions of law and fact common to the Class Members which predominate over any questions which may affect individual Class Members include, but are not limited to:

      i. Whether Defendant was responsible for the conduct alleged herein which was uniformly directed at all servicemen and women stationed at Camp Lejeune during the relevant time period;

      ii. Whether Defendant's misconduct set forth in this Complaint demonstrates that Defendant has engaged in unlawful and dangerous chemical contamination practices with respect to the water sources at Camp Lejeune;

18

iii. Whether Defendant made false and/or misleading statements and omissions to the Class and the public concerning the contents of the water at Camp Lejeune during the Relevant Time Period;

iv. Whether Defendant's false and misleading statements and omissions concerning the water sources at Camp Lejeune were likely to deceive the public; and

v. Whether Plaintiff and the Class are entitled to money damages under the same causes of action as the other Class Members?

c. Typicality: Plaintiffs are members of the Class. Plaintiffs' claims are typical of the claims of each Class Member in that every member of the Class was susceptible to the same hazardously contaminated water sources during the Relevant Time Period and consumed the water at Camp Lejeune. Plaintiffs are entitled to relief under the same causes of action as the other Class Members.

d. Adequacy: Plaintiffs are an adequate Class representative because their interests do not conflict with the interests of the Class Members they seeks to represent, their claims are common to all members of the Class, they has a strong interest in vindicating their rights, they have retained counsel competent and experienced in complex class action litigation, and counsel intends to vigorously prosecute this action.

e. Predominance: Pursuant to Rule 23(b)(3), common issues of law and fact identified above predominate over any other questions affecting only individual members of the Class. The Class issues fully predominate over any individual issues because no inquiry into individual conduct is necessary; all that is required

19

is a narrow focus on Defendant's hazardous chemical and drinking water practices.

f.  <u>Superiority</u>: A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

  i.  The joinder of thousands of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

  ii.  The individual claims of the Class Members may be relatively modest compared with the expense of litigating the claims, thereby making it impracticable, unduly burdensome, and expensive—if not totally impossible—to justify individual actions;

  iii.  When Defendant's liability has been adjudicated, all Class Members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

  iv.  This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

  v.  Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

  vi.  This class action will assure uniformity of decisions among Class Members;

  vii.  The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation; and

20

viii.  Class Members' interests in individually controlling the prosecution of separate actions are outweighed by their interest in efficient resolution by a single class action.

63.     Accordingly, this Class is properly brought and should be maintained as a class action under Rule 23(b)(3) because questions of law or fact common to Class Members predominate over any questions affecting only individual members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## CAUSE OF ACTION

## COUNT ONE: CAMP LEJEUNE JUSTICE ACT

### (On Behalf of Plaintiffs and All Class Members)

64.     Plaintiffs, on behalf of themselves and all others similar situated, respectfully incorporate by reference the allegations of the preceding paragraphs.

65.     Plaintiffs and Class Members resided at Camp Lejeune, North Carolina for not less than thirty (30) days between August 1, 1953 and December 31, 1987.

66.     During Plaintiffs' and Class Members' period of residence at Camp Lejeune, they were exposed to water that was supplied by, or on behalf of, the United States.

67.     Plaintiffs and Class Members were later diagnosed with a variety of diseases, cancers, birth defects, and other illnesses.

68.     A causal relationship exists between Plaintiffs' and Class Members' exposure to the water at Camp Lejeune and their diagnoses. The existence of the causal relationship is at least as likely as not.

69.     Plaintiffs and Class Members presented a claim to the United States Navy for money damages arising out of their exposure to the water at Camp Lejeune, which claims were

Case 7:23-cv-00022-D-KS   Document 1   Filed 02/10/23   Page 21 of 23

properly presented more than six months prior to the commencement of this action and did not result in a settlement.

70.     As a consequence of their diagnoses, Plaintiffs and Class Members have suffered and will continue to suffer significant harm, including (but not limited to) medical costs, pain and suffering, and a reduced life expectancy.

## CLASS CLAIM FOR RELIEF

## (CLJA)

## (On Behalf of Plaintiffs and All Class Members)

Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request that pursuant to section 804 of the PACT Act, the Court enter judgment against the United States and award damages and all other appropriate relief for the harm to Plaintiffs or their decedents that was caused by exposure to the water at Camp Lejeune.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and section 804 of the PACT Act.

*/s/Blake G. Abbott*
Blake G. Abbott (N.C. Bar No.  57190)
Eric Poulin (N.C. Bar No. 43861)
Roy T. Willey, IV *(Pro Hac Vice Forthcoming)*
Paul Doolittle (*Pro Hac Vice Forthcoming*)
**Poulin, Willey, Anastopoulo, LLC**
32 Ann Street
Charleston, SC 29403
843-834-4712
Email: blake@akimlawfirm.com
eric@akimlawfirm.com
roy@akimlawfirm.com

22

pauld@akimlawfirm.com

*Attorneys for Plaintiff*